FILED
Athens County,Ohio
09/23/2022 05:03 PM
Candy Russell Clrk
CaseNumber:22CI0168
Judge:MCCARTHY, GEORGE P

### IN THE COURT OF COMMON PLEAS
### ATHENS COUNTY, OHIO

| | | |
|---|---|---|
| Quick Loadz Container System, LLC | : | Case No. _____ |
| 5850 Industrial Dr. | | |
| Athens, Ohio 45701, | : | Judge _____ |
| | | |
| Plaintiff, | : | **PLAINTIFF'S COMPLAINT** |
| vs. | | **WITH JURY DEMAND** |
| | : | |
| | : | |
| Acme-Works, LLC | : | |
| c/o William L. Hall, Agent | | |
| 1735 La Vereda Road | : | |
| Berkeley, CA 94709 | | |
| | : | |
| and | : | |
| | : | |
| William L. Hall | | |
| 1500 Ferry Point | : | |
| Alameda, CA 94501 | | |
| | : | |
| Defendants. | : | |

### - COUNT ONE -
### DECLARATION OF RIGHTS AND OBLIGATIONS UNDER ACCEPTED QUOTE

1.  Plaintiff is a duly registered Ohio limited liability company, with it principal office located in Athens County, Ohio.

2.  Defendant Acme-Works, LLC is believed to be a duly registered California limited liability company.

3.  William L. Hall is believed to be a resident of California.

4.  On or about February 3, 2021, Plaintiff provided Defendant William L. Hall with a quote for the sale and purchase of a trailer, equipment, and parts as further described therein. A copy of this quote is attached hereto and marked as "Exhibit A".

5.  Plaintiff's quote was subject to terms and conditions of sale, as further described therein. These terms and conditions of sale are attached hereto and marked as "Exhibit B".





LAVELLE AND ASSOCIATES
TRIAL LAWYERS

449 E. STATE STREET
ATHENS, OHIO 45701

TELEPHONE (740) 593-3348
FACSIMILE (740) 594-3343

6.     A written copy of the Plaintiff's terms and conditions of sale were provided to Defendant William L. Hall, contemporaneously with the above mentioned quote.

7.     Defendant William L. Hall accepted the quote on or about February 4, 2021. This acceptance is noted on the lower half of the attached "Exhibit A".

8.     Plaintiff delivered the trailer, parts, and equipment described in "Exhibit A", to Defendant William L. Hall and Defendant paid for the same.

9.     Approximately 18 months after Plaintiff delivered the trailer, equipment and parts, Defendant William L. Hall demanded to return the purchased items to Plaintiff and further received back the full purchase price, delivery costs, refund of taxing, expenses associated with tie downs, and the costs of towing accessories.

10.     Plaintiff has made a good faith effort to resolve these disputes.

11.     A resolution has not been reached between the parties.

12.     The terms and conditions of the sale included, but were not limited to, the cancellation policy, the Plaintiff's warranties, the limitation of remedies and damages, a choice of law provision, and an arbitration provision.

13.     Defendant William L. Hall's demand does not conform with the terms and conditions of the sale.

14.     Pursuant to the choice of law provision in the terms and conditions, the validity, construction and performance of the buyer's order and the transactions to which it relates shall be governed by the law of the State of Ohio.

15.     Pursuant to the arbitration provision in the terms and conditions, all claims and disputes relating to these terms and conditions of the sale and transaction contemplated thereby shall be resolved by arbitration in Athens, OH, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and the decision of the arbitrator(b) may be enforced in any court having jurisdiction of the parties.

16.     There is a dispute between the parties regarding their rights and obligations under the accepted quote and terms and conditions of the sale.

17.     Plaintiff is seeking the Court's interpretation of the above mentioned terms and conditions of the sale, as well as a declaration of the parties' rights and obligations under these terms and conditions.

18.     Without this declaration, Plaintiff may suffer irreparable loss and damage by Defendant William L. Hall's confusion and misinterpretation over such rights and obligations.



JPL
LAVELLE AND ASSOCIATES
TRIAL LAWYERS

449 E. STATE STREET
ATHENS, OHIO 45701

TELEPHONE (740) 593-3348
FACSIMILE (740) 594-3343

2

19.    Such declaration is also necessary as Plaintiff has no other adequate remedy at
       law.

## - COUNT TWO -
## BREACH OF CONTRACT (ACCEPTED QUOTE)

20.    Plaintiff adopts by reference all of the above allegations as if fully rewritten
       herein.

21.    Defendant William L. Hall has breached the terms and conditions of the above
       mentioned accepted quote though his course of contact and demands made upon
       the Plaintiff.

22.    As a result of the above mentioned breach of the accepted quote, Plaintiff has
       sustained damages and other losses, including, but not limited to, a depreciation of
       the value of the trailer, parts, and equipment, that Defendant William l. Hall is
       demanding to return over 18 months after such items were delivered by Plaintiff.

23.    Plaintiff has attempted to mitigate its damages.

24.    WHILE THIS DOES NOT RELATE TO A PERSONAL, FAMILY, OR
       HOUSEHOLD TRANSACTION, PLAINTIFF NEVERTHELESS
       INCORPORATES ITS NOTICE UNDER THE FAIR DEBT COLLECTION
       PRACTICE ACT AS "EXHIBIT C".  WHILE THE ACT PROVIDES FOR 30
       DAYS TO RESPOND TO THE NOTICE, THE SUMMONS REQUIRES THE
       DEFENDANT TO FILE A RESPONSIVE PLEADING TO THIS COMPLAINT
       WITHIN 28 DAYS.

## - COUNT THREE -
## DECLARATION OF RIGHTS AND OBLIGATIONS UNDER
## CONTAINER SYSTEM DEALER AGREEMENT

25.    Plaintiff adopts by reference all of the above allegations as if fully rewritten
       herein.

26.    On or about February 9, 2022, Plaintiff and Defendant Acme-Works, LLC entered
       into a Quick Loadz Container System Dealer Agreement, which is hereafter
       referred to as the "Agreement".  A copy of this Agreement is attached hereto and
       marked as "Exhibit D".

27.    Defendant William L. Hall is the authorized representative for Defendant Acme-
       Works, LLC.

28.    Defendant Acme-Works, LLC has made demands upon Plaintiff that are
       inconsistent with the rights and obligations of the parties as set forth in the
       Agreement.



JP L
LAVELLE AND ASSOCIATES
T R I A L   L A W Y E R S

449 E. STATE STREET
ATHENS, OHIO 45701

TELEPHONE (740) 593-3348
FACSIMILE (740) 594-3343

3

29. Th above mentioned Agreement contains a governing law provision, which indicates that the Agreement shall be governed, construed, interpreted and enforced solely and exclusively in accordance with the laws and court of Athens County, Athens, Ohio, USA.

30. There is a dispute between the parties regarding their rights and obligations under the Agreement.

31. Plaintiff has made a good faith effort to resolve this dispute with Defendant Acme-Works, LLC, but no resolution has been reached.

32. Plaintiff is seeking the Court's interpretation of the above mentioned Agreement, as well as a declaration of the parties' rights and obligations under the Agreement.

33. Without this declaration, Plaintiff may suffer irreparable loss and damage by the Defendant Acme-Works, LLC's confusion over such rights and obligations.

34. Such declaration is also necessary as Plaintiff has no other adequate remedy at law.

**COUNT FOUR**
**BREACH OF CONTRACT (CONTAINER SYSTEM DEALER AGREEMENT)**

35. Plaintiff adopts by reference all of the above allegations as if fully rewritten herein.

36. Pursuant to the above mentioned Agreement, Defendant Acme-Works, LLC, agreed that it would maintain, during the terms of the Agreement, all resources (may include equipment, facilities, materials, and knowledgeable personnel) necessary to actively promote the sale of Plaintiff's products.

37. Upon information and belief, Defendant Acme-Works, LLC, has failed to continually provide such resources necessary to actively promote and sale of Plaintiff's products.

38. Pursuant to the Agreement, Plaintiff has received expensive items, at no cost, from Plaintiff, based on Defendant Acme-Works, LLC's representation that such items were necessary for the Defendant Acme-Works, LLC's dealership and promotion of Plaintiff's products.

39. Such items included, but are not perhaps not limited to, three (3) brain boxes, each with a retail value of $6,200.00, and a wiring harness.

40. Upon information and belief, Defendant Acme-Works, LLC, did not use such items for its dealership and promotion of Plaintiff's products.

41. Defendant Acme-Works, LLC, has breached the terms and conditions of the



LAVELLE AND ASSOCIATES
TRIAL LAWYERS

449 E. STATE STREET
ATHENS, OHIO 45701

TELEPHONE (740) 593-3348
FACSIMILE (740) 594-3343

above mentioned Agreement, including, but perhaps not limited to, through its actions above described.

42.    As a result of the above mentioned breach of the Agreement, Plaintiff has sustained damages and other losses.

43.    Plaintiff has attempted to mitigate its damages.

## - COUNT FIVE -
### BREACH OF EXPRESS AND IMPLIED WARRANTIES

44.    Plaintiff adopts by reference all of the preceding allegations as if fully rewritten herein.

45.    Defendant Acme-Works, LLC expressly gave Plaintiff various express warranties regarding the above mentioned Agreement. These express warranties included, but were not limited to Defendant Acme-Works, LLC, maintaining necessary resources to sell and actively promote Plaintiff's products.

46.    Defendant Acme-Works, LLC further gave an implied warranty that its work in selling and promoting Plaintiff's products would be done in a professional and salesman like manner, according to the usual standards and skills of such trade.

47.    Both the express and implied warranties were provided by Defendant Acme-Works, LLC, for the benefit of the Plaintiff.

48.    Defendant Acme-Works, LLC has breached its express warranties, including, but perhaps not limited to, failing to maintain resources necessary to sell and actively promote Plaintiff's products.

49.    Defendant Acme-Works, LLC has further breached its implied warranty by providing failing to perform its obligations in a profession and salesman like manner, according to the usual standards and skills of such trade.

50.    As a result of Defendant Acme-Works, LLC has breached both its express and implied warranties, Plaintiff has sustained damages in an amount to be determined at trial.

51.    Plaintiff has attempted to mitigate its damages.

## COUNT SIX - UNJUST ENRICHMENT

52.    Plaintiff re-alleges each and every allegation contained in the above paragraphs and incorporates the same by reference herein.



J P L
LAVELLE AND ASSOCIATES
T R I A L   L A W Y E R S

449 E. STATE STREET
ATHENS, OHIO 45701

TELEPHONE (740) 593-3348
FACSIMILE (740) 594-3343

5

53. Plaintiff asserts this unjust enrichment claim, in the alternative, to its above mentioned breach of contract claims.

54. Defendant William L. Hall has materially and substantially breached the terms and conditions of the above mentioned terms and conditions of the accepted quote.

55. Defendant Acme-Works, LLC, has materially and substantially breached the above mentioned Agreement.

56. Defendants have further financially benefitted and knowingly received the benefits provided by the Plaintiff, pursuant to both the accepted quote and Agreement.

57. Plaintiff may have no adequate remedy at law and has performed all conditions precedent in bringing this action for unjust enrichment.

58. Plaintiff has sustained damages and Defendants have been unjustly enriched.

### - COUNT SEVEN -
### FRAUD

59. Plaintiff adopts by reference all of the preceding allegations as if fully rewritten herein.

60. Upon information and belief, Defendant Acme-Works, LLC and Defendant William Hall misrepresented their intention to Plaintiff of selling and promoting Plaintiff's products when entering in to the above mentioned Agreement.

61. Upon information and belief, the above mentioned Agreement was entered into for an ulterior purpose for Defendant Acme-Works, LLC and Defendant William L. Hall to receive products from the Plaintiff at not cost, as well as to gain confidential information regarding Plaintiff's intellectual property.

62. Plaintiff was justified to rely on the representations of the Defendants with regard to entering into the above mentioned Agreement.

63. As a direct and proximate cause of the Defendants' frauds, Plaintiff has sustained monetary damages in an amount to be determined at trial.

### - COUNT EIGHT -
### PIERCING OF THE CORPORATE VEIL

64. Plaintiff re-alleges each and every allegation contained in the above paragraphs and incorporate the same by reference herein.



LAVELLE AND ASSOCIATES
T R I A L   L A W Y E R S

449 E. STATE STREET
ATHENS, OHIO 45701

TELEPHONE (740) 593-3348
FACSIMILE (740) 594-3343

6

65. Defendant William L. Hall is the member and owner of Defendant Acme-Works, LLC.

66. Upon information and belief, Defendant Acme-Works, LLC, entered into the above described Agreement for the ulterior purpose of obtaining the above mentioned equipment and intellectual property of Plaintiff as no expense for the sole benefit of Defendant Acme-Works, LLC and Defendant William L. Hall.

67. Defendant William L. Hall further individually exercised control over Defendant Acme-Works, LLC, so completely that the Defendant Acme-Works, LLC had no separate mind, will, or existence of its own.

68. Defendant William L. Hall individually, is not entitled to the protections of his alter ego, Defendant Acme-Works, LLC, by by virtue of their fraudulent conduct and other tortious conduct as described above, and should be held personally liable to the Plaintiff for the damages that Defendant Acme-Works, LLC has caused.

69. This Court should determine that the Plaintiff is entitled to pierce the corporate veil of Defendant Acme-Works, LLC and also award judgment to the Plaintiff, against Defendant William L/ Hall, Individually.

**WHEREFORE**, Plaintiff prays for a judgment as follows:

A. For Judgment on Count One declaring the rights and obligations of the Plaintiff and Defendant William L. Hall under the terms and conditions of the accepted quote.

B. An order directing Defendant William L. Hall's compliance with the terms and conditions of the accepted quote, including, but not limited to, the appointment and referral to an arbitrator for arbitration to be completed in Athens County, Ohio.

C. For a Judgment on Count Two against Defendant William L. Hall in a sum to be determined at trial, which is anticipated to exceed $25,000.00, or in the alternative, a set-off against any counter-claim for such amount.

D. For Judgment on Count Three declaring the rights and obligations of the Plaintiff and Defendant Acme-Works, LLC, under the Quick Loadz Container System Dealer Agreement.

E. For a Judgment on Count Four and Count Five against Defendant Acme-Works, LLC in a sum to be determined at trial, which is anticipated to exceed $25,000.00, or in the alternative, a set-off against any counter-



JPL
LAVELLE AND ASSOCIATES
T R I A L   L A W Y E R S

449 E. STATE STREET
ATHENS, OHIO 45701

TELEPHONE (740) 593-3348
FACSIMILE (740) 594-3343

7

claim for such amount.

F.    In the alternative, for a Judgment on Count Six against both Defendants, in a sum to be determined at trial, which is anticipated to exceed $25,000.00, or a set-off against any counter-claim for such amount.

G.    For a Judgment on Count Seven and Count Eight, against both Defendants, in a sum to be determined at trial, which is anticipated to exceed $25,000.00

H.    For a Judgment for punitive damages both jointly and severally against both Defendants, in a sum exceeding $25,000.00.

G.    For a Judgment against the Defendants, both jointly and severally, for attorneys' fees, costs, and interest (both pre-judgment and post-judgment), along with any other relief deemed equitable.

Respectfully submitted,

Robert R. Rittenhouse - 0079276
Attorney for the Plaintiff

Lavelle and Associates
449 E. State Street
Athens, OH 45701
(740) 593-3348 - telephone
(740) 594-3343 - facsimile
rusty@johnplavelle.com



JPL
LAVELLE AND ASSOCIATES
T R I A L   L A W Y E R S
449 E. STATE STREET
ATHENS, OHIO 45701

TELEPHONE (740) 593-3348
FACSIMILE (740) 594-3343

## **JURY DEMAND**

A jury is hereby demanded upon all causes of action.

Respectfully submitted,

Robert R. Rittenhouse - 0079276
Attorney for the Plaintiff

J P L
LAVELLE AND ASSOCIATES
T R I A L   L A W Y E R S

449 E. STATE STREET
ATHENS, OHIO 45701

TELEPHONE (740) 593-3348
FACSIMILE (740) 594-3343

9



Exhibit A

2/3/2021
QuickLoadz
5850 Industrial Dr
Athens, OH 45701
Phone 740-206-7758
Fax 866-645-7892
Shemler@QuickLoadz.com

0203202126kC40W08030
William Hall
510-306-8216
bill@whall.net
1500 Ferry Point
Alameda, CA 94501

| | | | | | |
|---|---|---|---|---|---|
| 1 | 26k Super 40 | $ | 84,700.00 | $ | 84,700.00 |
| | Hydraulic Jacks | $ | 950.00 | $ | 950.00 |
| | 15,000# axles | $ | 1,650.00 | $ | 1,650.00 |
| | Galvanized Trailer Bed | $ | 7,200.00 | $ | 7,200.00 |
| 8 | Heavy Duty Tie-Down Ratchets | $ | 75.00 | $ | 600.00 |
| | Hutch 9700 Spring Suspension | $ | 1,175.00 | $ | 1,175.00 |
| | Electric Over Hydraulic Drum Brakes | $ | 1,452.00 | $ | 1,452.00 |
| | Gooseneck Coupler | $ | 865.00 | $ | 865.00 |
| | Gooseneck 5th Wheel Pin Insert | $ | 450.00 | $ | 450.00 |
| | Mud Flaps | $ | 90.00 | $ | 90.00 |
| | 10W Solar Battery Smart Charger | $ | 240.00 | $ | 240.00 |
| | Spare Tire | $ | 380.00 | $ | 380.00 |
| | 48" x 18" x 18" Steel Toolbox | $ | 800.00 | $ | 800.00 |
| | Dual 20' Container Locking Pins | $ | 700.00 | $ | 700.00 |
| | Tow Package (Plates + Bar) | $ | 1,125.00 | $ | 1,125.00 |
| | Cash Payment 10% Discount | $ | (10,237.70) | $ | (10,237.70) |
| | Bed Glavanized and silding axles Black | | Price w/ Options | $ | 92,139.30 |
| | Aluminum or chrome wheels | | Est. Delivery | $ | 5,000.00 |
| | | | Total | $ | 97,139.30 |
| | | 20% Deposit Due w/ Order | | $ | 19,427.86 |
| | | Balance Due Prior to Delivery FOB Athens, OH | | $ | 77,711.44 |

*Quote Accepted Feb 4, 2021 and deposits wired*

*William L Hall*

*William L Hall*

*2/4/21*

**Specs:**
- Deck Length - 40'
- Overall Length - 51' 10"
- GVW Capacity - 26,000 lb
- Curb Weight - 12,000 lb
- Payload Capacity - 26,000 lb
- Deck Height - 38"
- Decking - 3/16" Tread Plate Metal Decking
- Jack Type - Hydraulic
- Hoist Type - Tilt and Slide
- Load Angle - 8 Degrees
- Brake Type - Electric Over Hydraulic
- Winch Capacity - 20,000 lb dual chain drive
- Finish - Galvanized

- Hydraulic Power Source - 38 HP EFI Kohler
- Coupler - Gooseneck
- Suspension - Hutch 9700 Spring
- Tires - 215/75R17.5
- Main Frame - W12 × 26= I Beam
- Side Rails - 7" Continuous Bend
- Cross Members - 5" C-Channel 16" oc
- Tongue - Cold Formed Main Beam
- Axles - 2 15,000# Oil Bath Bearing
- Conspicuity Striping - YES
- Full Width Rear ICC Bumper - YES
- LED Lights - YES
- QuickLoadz Moving System - Dual Chain Drive: 6

Quotation prepared by: **Sam Hemler**

This is a quotation on the goods named, subject to the conditions noted below: Quote is only valid for 7 days. After that 7 days, please call QuickLoadz for an updated scope of work (and associated cost). This quote is not a purchase order, or an agreement to buy. To accept this quotation, sign here and return:

Exhibit B

## QUICKLOADZ TERMS AND CONDITIONS OF SALE

1. **OFFER AND ACCEPTANCE.** Acceptance by Buyer is limited to these terms and conditions of sale. No addition to or modification of any printed provision of these terms and conditions will be binding upon Seller (and Seller hereby objects to and rejects the same) unless made in writing (referring specifically to the relevant order and these terms and conditions of sale) and signed by an authorized officer of Seller. Neither commencement of performance nor delivery shall be deemed or construed as an acceptance by Seller of Buyer's additional or different terms. Buyer's execution and return of the acknowledgment copy hereof shall be conclusively deemed to be acceptance of all of these terms and conditions of sale. Seller's failure to object to terms contained in any communication from Buyer shall not be deemed to be a waiver of these terms and conditions of sale.

2. **PRICE.** The prices and charges stated on the face of this document shall be adjusted to and the goods covered by this order shall be invoiced at the prices and charges fixed by Seller at the time of and for each shipment under this order; provided that such prices and charges shall not exceed the price and charges appearing in Seller's applicable price schedules, if any, in effect at the time of each such shipment. The prices specified herein do not include any insurance, transportation, shipping, taxes or duties, now or hereafter enacted, relating to the goods provided hereunder, all of which shall be Buyer's responsibility, except as otherwise agreed to in writing between the Seller and Buyer. Buyer shall pay all sales or other taxes, however designated or levied (including any value-added or similar tax that may be imposed), on the sale or use of such goods other than taxes based upon Seller's net income. If Seller is required by law to collect such taxes (federal, state or local), all taxes thereof shall be added to invoices as separately stated charges and paid in full by Buyer unless Buyer is exempt from such taxes and furnishes Seller with a certificate of exemption in a form reasonably acceptable to Seller prior to issuance of such invoice.

3. **PAYMENT TERMS.** If Seller extends credit to Buyer, the terms of payment shall be net thirty (30) days after the date of invoice, except as otherwise agreed to in writing between the Seller and Buyer. If Seller does not extend credit to Buyer, payment for goods delivered hereunder shall be in advance of, or as a condition to, delivery of such goods, as Seller may direct. If for any reason Buyer's account exceeds the total approved credit line, the amount of overage will become immediately due and payable. In addition, if Buyer places an order for goods or services which will cause Buyer's outstanding credit to exceed the amount of approved credit, the amount over Buyer's approved credit must be paid in advance of, or as a condition to, delivery of goods under such order. If any invoice shall not be paid when due, then (i) the lesser of one and one-half percent (1 1/2%) of the unpaid balance (annual rate of 18%) or the maximum late payment penalty charge permitted by the law will be added for each month or part thereof that payment is delayed and (ii) all sums owing under this or any other agreement between Buyer and Seller may be declared due and Seller may defer performance under this and any other agreement until such invoice is paid without liability or penalty to Seller. Payment shall be made without regard to whether Buyer has made or may make any inspection or tests. In the event of foreign sales, Buyer shall be responsible for payment of all costs, fees and expenses, including, without limitation, those covering preparation of consular documents, consular fees, letter of credit, bank fees, ocean freight, storage and insurance, except as otherwise agreed to in writing between the Seller and Buyer. Buyer may set off any amount owing from Seller to Buyer against any amount payable by Buyer to Seller under Buyer's order, whether or not related to this order. Anything herein to the contrary notwithstanding, if the shipment of goods is delayed at Buyer's request, payment shall be due on the date Seller is prepared to make such shipment of goods. Any goods held thereafter by Seller or carrier for Buyer shall be at Buyer's sole risk and expense. In the event any proceeding is brought by or against Buyer under the bankruptcy or insolvency laws, Seller shall be entitled to treat such event as a repudiation by Buyer and, in addition to other remedies, cancel any order then outstanding. Buyer shall be liable for any collection costs or attorneys' fees incurred in or associated with Seller's attempt to collect amounts due from Buyer or other failure of Buyer to comply with these terms and conditions. All sales are subject to the approval of Seller's credit department. Unless obligated by law, Seller shall not be obligated to disclose its pricing or cost data or formulae.

4. **DELIVERY AND RISK OF LOSS; TRANSFER OF TITLE.** Shipment shall be F.O.B. Seller's place of business, freight collect, unless otherwise agreed in writing with Buyer. The method of shipment and carrier shall be selected by Seller unless Buyer shall have specified in writing a method of shipment and carrier prior to scheduled shipment. All risks of and liability for loss or damage to any goods hereunder shall pass to Buyer upon delivery to carrier. Prior to Buyer's full payment of the purchase price, legal title to the goods shall remain in Seller. Upon payment in full of the purchase price to Seller, title to the goods shall vest in the Buyer.

5. **DELAY IN DELIVERY/FORCE MAJEURE.** Buyer expressly acknowledges that Seller shall not be held liable and/or responsible for any nonperformance including without limitation the failure to deliver or any failure in performance or delivery which is caused, in whole or in part, by the occurrence of any contingency beyond the control of Seller, including, but not limited to, war (whether actual declaration thereof is made or not), sabotage, insurrection, riot or other act of civil disobedience, act of a public enemy, judicial action, any act of government or any agency or subdivision thereof, labor dispute (including lockouts, strikes and slowdowns); transportation failures or delays; failures and/or delays on the part of subcontractors and/or suppliers; shortages of goods; shortage of workers; worker disagreements; court injunction or order; government regulations; or Executive orders, failure or delay in transportation, shortage of labor, fuel, raw materials, tools, dies or equipment, or any technical or field failure. Any such delays shall excuse Seller from performance and Seller's time for performance shall be extended for the period of the delays and for a reasonable period thereafter. The preceding list is not exclusive and, moreover, Buyer expressly agrees that Seller shall not be liable and/or responsible for any other cause beyond the commercially reasonable control of Seller. The time for performance on the part of Seller, if such a delay should result, is extended for whatever length of time that the delay may necessitate.

6. **CANCELLATION/RESCHEDULING POLICY.**

   a. If Buyer cancels an accepted order before Seller orders any raw materials or incurs any actual costs required to fulfill the order, no cancellation charge shall apply. The parties agree, however, that Seller will incur costs (including, but not limited to, carrying costs) and expenses for which Seller should be reimbursed in the manner set forth in subparagraph b hereof.

   b. Seller shall be entitled to receive from Buyer as cancellation charge: (i) Seller's total costs incurred in processing the canceled order from the order stage to the stage that the order is in at the time Seller receives notice from Buyer that the order is canceled; and (ii) an additional sum which would make the profit on the transaction equal to the average profit margin on the pertinent goods during the preceding calendar year.

   c. Buyer requests for either earlier or later delivery will be accommodated, if possible, at the sole discretion of Seller; however, a rescheduling request by the Buyer that extends sixty (60) days past the originally scheduled shipment date will grant to Seller the option to either sell the goods for other order application or proceed with final production processing and ship to Buyer at full order value plus accruals for extensions.

   d. The words "cancel" or "cancellation" as used herein are intended to include, in addition to an express cancellation, any conduct constituting a breach or repudiation of these terms and conditions of sale.

   e. Seller reserves at all times and at its option the absolute right to cancel any unfinished part or portion of the order should Buyer breach the contract. Seller may, in such an event, enforce payment from Buyer for the entire contract value of any goods which are already completed, finished or identified in the contract; any expenditure of labor on the goods; any loss suffered as a result of the breach of this contract; any cost of materials or supplies in the process; and any costs incurred for material, labor, engineering, material handling, manufacturing, sales and administrative overhead, a reasonable profit mark-up; and any other costs which Seller incurs.

   f. Buyer's order shall not be terminated by Buyer without Seller's prior written consent. If Seller so consents to such termination, Buyer shall be liable for termination charges including, without limitation, a price adjustment based on the quantity of goods and/or services actually delivered and all costs, direct, incurred and committed for Buyer's order together with reasonable allowance for prorated expenses and anticipated profits. Seller shall have the right to terminate Buyer's order if (i) in Seller's sole judgment, Buyer's financial condition does not justify the terms of payment applicable from time to time and Buyer shall not immediately comply with any modification of payment terms required by Seller in accordance with paragraph 3, or (ii) if Buyer fails to pay for the goods when payment is due or make arrangements to do so which are acceptable to Seller; or (iii) Buyer defaults in any agreement with Seller or with any third party providing financing to Buyer; or (iv) if Buyer engages in a course of conduct which, in the sole judgment of Seller, substantially and adversely affects Seller's reputation or its interests in the promotion, marketing and distribution of its products, or is otherwise deemed to be just cause for termination pursuant to prevailing laws. Upon termination of Buyer's order, all sums, including interest, owing by Buyer to Seller shall immediately become due and payable without notice and Seller shall thereupon have all of the rights and remedies of a seller under applicable law, and as may be provided in these terms and conditions of sale. If Seller exercises such right to terminate, Buyer shall be liable for the charges and adjustments referred to herein, in addition to any other remedies Seller may have hereunder or at law.

7. **CHANGE IN ORDER.** If Buyer changes an order, Buyer shall compensate Seller for any and all additional charges or costs incurred by Seller, including but not limited to, the cost of overtime, price premiums to acquire raw material on an expedited basis, and cancellation charges. Any such changes shall be subject to Seller's acceptance and any additional charges resulting from such changes shall be due and payable upon invoicing.

8. **SOFTWARE.** To the extent the product ordered includes any software, in no event does the sale of the product to the Buyer transfer any ownership rights in such software to Buyer. Seller or its licensors retain all right, title, and interest (including all intellectual property rights) in such software. Seller grants Buyer a nonexclusive, nontransferable (except as part of the sale of the equipment), perpetual license to use the software solely in connection with Buyer's use of the product.

9. **WARRANTIES, REMEDIES, DAMAGES AND LIMITATIONS.**

   a. Warranty. Except as otherwise provided herein, Seller warrants for a period of one (1) year after delivery of any product that such product will be free from defects in materials or workmanship and will conform to Seller's published specifications and that specifications set forth on the face hereof under normal use and service. All goods will be subject to certain tolerances and variances consistent with usual trade practices, practical testing, inspection methods, and applicable specifications regarding dimensions, material and surface requirements, composition, internal conditions and quality. Such warranties shall not apply to goods which have been subjected to accident; misuse; abuse; neglect; or improper handling, transport, storage, handling, use or application, installation, testing or maintenance; or unauthorized repair. The Buyer's exclusive remedy and Seller's sole and exclusive liability for breach of these warranties is, at Seller's expense and option, either repair or replacement of the defective good returned to Seller within the warranty period or refund of the purchase price therefor or credit for future purchases. Buyer's right to pursue this remedy is expressly conditioned on Buyer's written notice of the failure to the Seller, within the warranty period and the prompt return of the goods to the Seller, C.I.F. Seller's place of business. Goods that are repaired or replaced shall be returned to the Buyer. These warranties shall not

   be enlarged, diminished or affected by, and no obligation or liability shall arise or grow out of, Seller's rendering of technical advice or service in connection with goods supplied by Seller.

   b. Disclaimer of Consequential and Incidental Damages. In no event shall Seller be liable for special, indirect, incidental, consequential or punitive damages, including but not limited to those arising out of personal injury, death or property damage suffered as a result of failure of this product to warn, or to adequately warn, against the presence of hazardous or toxic substances or lost user profits or revenues even if Seller has been advised of the possibility of such loss or damage.

   c. Total Liability. The total liability of Seller for any claim arising under these terms and conditions of sale shall be limited to the purchase price of the goods.

   d. Limitations. The warranties contained herein are the exclusive warranties given to the Buyer. THE SELLER EXPRESSLY DISCLAIMS ANY AND ALL OTHER WARRANTIES WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTIES ARISING BY TRADE USAGE, COURSE OF PERFORMANCE OR COURSE OF DEALING.

   e. Time to Notify. Seller must be notified of any warranty claims prior to the expiration of the applicable warranty period. Any action for breach of these terms and conditions of sale or the warranties hereunder must be commenced within thirteen (13) months from the date when tender or delivery of the goods is made.

   f. Supplier Warranty. As to items not manufactured by Seller, Seller hereby assigns to Buyer and Buyer agrees to accept any warranty which Seller's suppliers may have issued, but only to the extent that such assignment is authorized by Seller's contract with its supplier. A copy of any such warranty is available for review to Buyer upon request.

   g. Resale. Seller's warranties are extended to Buyer only and Seller makes no warranties whatsoever to Buyer's customer or any other third party. If Buyer resells or otherwise transfers the goods subsequent to Buyer's receipt of the goods, Buyer will have no authority to make any warranty or representation to Buyer's customer or any other party on behalf of Seller.

10. **INDEMNITY.**

   a. Buyer. Buyer shall defend, indemnify and hold harmless Seller, its respective officers, directors, agents, subsidiaries, affiliates, subcontractors, assignees and employees, or any of them, from and against all losses, damages (actual, incensed, or statutory), liabilities, expenses, costs (including court costs and attorney's fees), claims, suits, demands, actions, causes of actions, proceedings, judgments, assessments, deficiencies and charges ("Damages") caused by, relating to or arising from personal injury, death, or property damage arising from Buyer's use of the goods provided hereunder, unless such Damages have been caused solely by a defective product provided by Seller hereunder. This subparagraph 10(a) shall survive termination or expiration of Buyer's order.

   b. Intellectual Property Indemnity. Seller will defend any suit or proceeding brought against Buyer to the extent that such suit or proceeding is based on a claim that goods manufactured and sold by Seller to Buyer hereunder, including any software provided hereunder, constitute direct infringement of any valid United States patent and Seller shall pay all Damages awarded by final judgment (from which no appeal may be taken) against Buyer holding that such goods do so infringe, on condition that Seller: (i) is promptly informed and furnished a copy of each communication, notice or other action relating to the alleged infringement; (ii) is given authority, information and assistance necessary to defend or settle such suit or proceeding in such a manner as Seller shall determine; and (iii) is given sole control of the defense (including the right to select counsel), and the sole right to compromise and settle such suit or proceeding. If any goods manufactured by Seller and supplied by Seller to Buyer are held to directly infringe any valid United States patent as set forth above, and Buyer is enjoined from using the goods hereunder, including any software furnished thereunder, Seller will exert reasonable efforts, at its option and its expense: (A) to procure for Buyer the right to use such goods free of any such liability for patent infringement; (B) to replace or modify such goods with a non-infringing substitute otherwise complying substantially with the specifications for such goods; or (C) upon return of the goods, refund the transportation costs and the purchase price, less any applicable depreciation or credit for use, of such goods. If the infringement is alleged prior to completion of delivery of the goods, Seller has the right to decline to make further shipments without being in breach of contract. If Seller has not been enjoined from selling such goods to Buyer, Seller may (at Seller's sole election), at Buyer's request, supply such goods to Buyer in which event Buyer shall be deemed to extend to Seller an indemnity of comparable scope to that hereinabove provided. A comparable indemnity as that set forth above shall also be deemed to be extended to Seller by Buyer if any suit or proceeding is brought against Seller based on a claim that the goods manufactured by Seller in compliance with Buyer's specifications infringe any valid United States patent.

   c. Limitation of Proprietary Rights Indemnification. In no event shall Seller be liable for any: (i) infringement by goods not sold by Seller to Buyer hereunder; (ii) infringement arising from a combination with, addition to, or modification of the goods after delivery by Seller; (iii) infringement arising out of compliance with Buyer's specifications or (iv) any royalties other than a reasonable royalty based upon revenue derived by Seller from Buyer from sales of the infringing goods.

   THE FOREGOING STATES THE SOLE AND EXCLUSIVE LIABILITY OF SELLER FOR INFRINGEMENT OR THE LIKE OF PATENTS, TRADEMARKS, COPYRIGHTS, TRADE SECRETS AND OTHER INTELLECTUAL PROPERTY RIGHTS IN CONNECTION WITH THIS ORDER, WHETHER DIRECT OR CONTRIBUTORY, AND IS IN LIEU OF ALL WARRANTIES, EXPRESS, IMPLIED OR STATUTORY IN REGARD THERETO, INCLUDING, WITHOUT LIMITATION, THE WARRANTY AGAINST INFRINGEMENT SPECIFIED IN THE UNIFORM COMMERCIAL CODE.

11. **INSPECTION AND ACCEPTANCE.** All goods delivered hereunder shall be tested and inspected by Buyer within fifteen (15) days after receipt thereof, and such goods shall be conclusively deemed accepted by Buyer unless a written notice of rejection has been sent by Buyer to Seller within such fifteen (15) day period. Rejected goods shall be placed by Buyer in safe storage for inspection by Seller or returned by Buyer in accordance with the requirements of paragraph 9 hereof. Buyer shall only have the right to reject goods that do not conform to Seller's warranties provided herein. Rejected goods remain at Buyer's risk until returned to Seller.

12. **ASSIGNMENT.** Except as otherwise permitted herein, Buyer's order is binding upon and inures to the benefit of the parties hereto and the successors and assigns of the entire business and goodwill of either Seller or Buyer, or to the successors and assigns of that part of the business of either used in the performance of Buyer's order, but will not otherwise be assignable except that the Seller has the right to assign this Buyer's order to an affiliate, as well as the right to assign accounts receivable or the proceeds of Buyer's order. Nothing contained herein shall inure to the benefit of or be deemed to give rise to any rights in any third party, whether by operation or law or otherwise.

13. **CONFIDENTIALITY.**

   a. All confidential information, know-how, programming, software, copyrighted materials, trademarks, trade secrets, documentation, plans drawings, specifications, processes, techniques, test results, designs and patterns furnished or created by Seller or by Seller's agents or subcontractors (other than Buyer) and all property rights embodied therein are and shall remain the sole property of Seller and neither Buyer nor any other party shall have or acquire any title to or interest therein.

   b. Buyer recognizes and acknowledges that it may gain access to certain confidential, secret or proprietary information possessed by Seller (information) which is a valuable business asset of Seller and that disclosure or unauthorized use of the information would cause grave and irreparable injury to Seller. Buyer shall at all times, whether during the terms of Buyer's order or subsequent thereto, hence, maintain and protect the confidentiality of such information. Buyer will take appropriate action to restrict access to such information to those of its employees and agents who have actual need for such access in the course of their duties. Buyer shall not make use of any such information for use information in any manner contrary to the purposes of this Buyer's order without prior written consent of Seller.

14. **NON-WAIVER/ENTIRE AGREEMENT.** This writing evidences the entire agreement between the parties and supersedes all prior and contemporaneous written or oral representations or agreements. These terms and conditions of sale may not be altered, modified or waived orally, by course of performance, course of dealing or usage of trade. No failure by either party to enforce at any time or for any period of time any of the provisions of these terms and conditions of sale shall not constitute a waiver of such provisions or of the right of each party to enforce each and every provision. No provision hereof and no default under or breach of any provision shall be deemed waived by reason of any previous waiver of such provision of any breach thereof.

15. **SEVERABILITY.** If any term or condition of these Terms of Sale is declared invalid by a court, agency, commission or other tribunal or entity having jurisdiction thereof, the application of such provision to parties or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term not so declared invalid or unenforceable shall be valid and shall be enforced to the fullest extent permitted by law and the rights and obligations of the parties shall be construed and enforced as though a valid commercially reasonable term consistent with the undertakings of the parties hereunder has been substituted in place of the invalid provision.

16. **CHOICE OF LAW AND ARBITRATION.** The validity, construction and performance of this Buyer's order and the transactions to which it relates shall be governed by the laws of the State of Ohio, without regard to conflict of laws principles and excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods. All claims and disputes relating to these terms and conditions of sale and all transactions contemplated hereby shall be resolved by arbitration in Athens, OH, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and the decision of the arbitrator(s) may be enforced in any court having jurisdiction over the parties. Nothing herein shall be construed as limiting Seller's right to maintain an action or to enforce any judgment in any jurisdiction in which Buyer or any assets of Buyer may be located.

17. **EXPORT RESTRICTION.** Buyer understands that certain goods furnished hereunder are or may be subject to export and/or import control laws or regulations from one or more applicable jurisdictions. Buyer hereby agrees that it will comply with all applicable international, national, federal, state and local laws, as well as all ordinances, orders, rules, regulations and requirements relating to the export or other regulation of all goods sold to Buyer hereunder. Buyer agrees that it shall not make any disposition of the products purchased or technology acquired from Seller by way of transshipment, re-export, diversion or otherwise, other than in and to the ultimate country of destination specified on Buyer's order or declared on the face of this document, except as the applicable laws or regulations may expressly permit. Buyer hereby agrees to indemnify and hold Seller harmless from and against any and all loss, damage or liability whatsoever arising out of Buyer's failure to comply with the provisions of this paragraph, unless and to the extent that Seller has expressly assumed the obligation to comply with the provisions of this paragraph.

Exhibit C

**UNLESS YOU NOTIFY THIS OFFICE WITHIN THIRTY (30) DAYS AFTER THE DATE OF THIS LETTER THAT YOU DISPUTE THE VALIDITY OF THE DEBT OR ANY PORTION THEREOF, THIS OFFICE WILL ASSUME THIS DEBT IS VALID.  IF YOU NOTIFY THIS OFFICE IN WRITING WITHIN THIRTY (30) DAYS FROM RECEIVING THIS NOTICE, THIS OFFICE WILL OBTAIN VERIFICATION OF THE DEBT OR OBTAIN A COPY OF THE JUDGMENT AND MAIL YOU A COPY OF SUCH VERIFICATION.  IF YOU MAKE A WRITTEN REQUEST OF THIS OFFICE WITHIN THIRTY (30) DAYS FROM THE DATE OF THIS LETTER, THIS OFFICE WILL PROVIDE YOU WITH THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR, IF DIFFERENT FROM THE CURRENT CREDITOR.  THIS IS AN ATTEMPT TO COLLECT A DEBT.  ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Exhibit D

## Quick Loadz Container
## System Dealer Agreement

**THIS DEALER AGREEMENT** ("Agreement") is made and entered into as of the ___ day of   , 2020 ("Effective Date"), by and between:

Quick Loadz Container System ("QuickLoadz") with a principal place of business at

5850 Industrial Dr Athens, OH 45701

and  Acme-Works, LLC dba CoyoteContainer.com 1735 LaVereda Rd, Berkeley, CA 94709

("Dealer")

**WHEREAS** QuickLoadz is engaged in the manufacture, distribution and sale of trailers and truck beds.

**AND WHEREAS** Dealer has experience marketing and selling trailers and truck beds to customers in the Territory, as hereinafter defined, and desires to act as an independent non-exclusive Dealer of Trailers and truck beds to customers ("Customers") in the Territory, subject to the terms and conditions set out in this Agreement and in compliance with all state laws pertaining to trailer and automotive dealers;

**NOW THEREFORE** in consideration of the representations, warranties, covenants, and agreements hereinafter contained and for other good and valuable consideration (the receipt and sufficiency of which are hereby by the parties acknowledged),  it is agreed by and between Dealer and QuickLoadz as follows:

## APPOINTMENT AND TRAILERS AND TRUCK BEDS

1.1 **Appointment**.  For and during the term of this Agreement, QuickLoadz hereby appoints Dealer as an independent  Dealer with the non-exclusive  right to promote, sell, distribute, market, buy and resell (collectively referred to herein as to "distribute") the Trailers and truck beds and Dealer hereby  accepts  such  appointment, subject  to the terms  and  conditions  hereof.  Dealer covenants and warrants that entering into this Agreement and performing the duties hereunder is not and will not be in violation of any agreement or other obligation to which Dealer is subject or by which Dealer is bound. Dealer acknowledges that QuickLoadz retains the right to promote, sell, distribute and market Trailers and truck beds in the Territory in its own right and through other distributors, dealers and agents.

1.2 **Territory**.  The appointment of Dealer hereunder is strictly limited to the distribution of the Trailers and truck beds to Customers within 200 miles of any permanent working dealership location open to the public for sales only ("Territory"). Territory is non-exclusive and other dealers may be placed within 200 miles. Dealer covenants and agrees that it will not directly or indirectly distribute, ship, sell for trans-shipment, solicit the sale of, take orders (whether by telephone or otherwise) for, establish a branch, maintain any distribution depot for, sell, lease or otherwise distribute the Trailers and truck beds from or to any customers or locations outside the Territory. In the event Dealer receives an inquiry, an offer to purchase, or a request for quotation regarding the Trailers and truck beds from outside the Territory, Dealer agrees to promptly forward all information regarding such matter to QuickLoadz. QuickLoadz will not place another dealer within 10 miles of any permanent working dealership location open to the public for sales.

1.3 **Trailers and truck beds**.  Dealer shall not manufacture, duplicate, modify, add to, or alter the Trailers and

truck beds or the warranties (or obliterate, alter, modify, change, or add to any packaging, promotional material or labels accompanying same or affixed thereto), except as may be authorized in writing by QuickLoadz from time to time. QuickLoadz reserves the immediate right, without prior notice and without liability, to modify, alter, improve, or change the design and/or specifications of, or discontinue the sale of and/or the manufacture of any particular model of any Product. If any such alteration, improvement, modification, or change is made, there will be no obligation on the part of QuickLoadz to: (a) repurchase or replace any such Trailers and truck beds previously sold to Dealer; (b) make such modification, alteration, improvement, or change on any Trailers and truck beds to be shipped or sold to Dealer; (c) make or offer a similar modification, alteration, improvement, or change on any Product or parts previously shipped to Dealer; or (d) install or furnish any other or different parts than were on Trailers and truck beds when shipment was made.

<u>RELATIONSHIP OF PARTIES</u>

**2.1 General Nature of Relationship.** Dealer represents and warrants that it has experience selling goods similar to the Trailers and truck beds in the Territory and knowledge regarding the market for such goods in all or part of the Territory. Dealer further represents and warrants that it has the necessary business and financial resources to fulfill its obligations hereunder. Dealer further agrees to exert its best efforts to distribute the Trailers and truck beds in accordance with the provisions hereof. Based in part on the foregoing representations and warranties of Dealer, QuickLoadz is entering into this Agreement. It is expressly agreed between the parties hereto that the relationship hereby established is solely one of independent seller and buyer. Dealer shall have sole control over the manner and means of conducting its business subject always to Dealer's compliance herewith. No fiduciary, special, trust or family relationship is established hereby, nor is any such relationship intended by the parties to result from operation hereof, it being intended and agreed that the relationship created hereby is and shall at all times continue to be one of independent contractors whose relationship is governed solely by this Agreement. Nothing in this Agreement shall be construed as constituting Dealer as a franchisee, attorney-in-fact, or legal representative of QuickLoadz for any reason whatsoever. Neither Dealer nor any director, officer, agent, or employee of Dealer shall be, or be considered, an agent or employee of QuickLoadz. Neither Dealer, nor any director, officer, agent, or employee of Dealer shall be entitled to any of the benefits provided to employees of QuickLoadz. Dealer shall have the sole right to hire and fire its own employees and agents and, further, Dealer shall be solely responsible for its acts and failures to act and the acts and failures to act of its employees and agents.

**2.2 No Agency, Joint Venture or Partnership**. Neither the making of this Agreement nor the performance of any part of this Agreement shall be construed in any circumstance to constitute Dealer as an agent of QuickLoadz for any purpose, nor shall this Agreement be deemed to establish a joint venture or partnership between the parties hereto.

**2.3 Investment and Expenses.** The parties acknowledge that the operation of Dealer's business, whether related hereto or otherwise, is subject to the sole control and management of Dealer. Dealer agrees that it has been and shall continue to be solely responsible for all expenditures and expenses connected with or related to Dealer's investment in and operation of its business in the Territory, all of which shall be made at the sole discretion of Dealer. Such expenditures include, but are not limited to, those amounts expended in connection with: hiring, training and maintenance of sales, management, technical, repair, delivery, administrative, or other personnel; equipment or facilities; salaries; commissions; insurance; rent; inventory; advertising and promotional costs; and taxes. Dealer agrees that any and all amounts that may be expended or invested by Dealer that in any way relate to the performance of this Agreement, shall be incurred and spent voluntarily by Dealer based on its best business judgment. All decisions with respect to investment in and operation of Dealer's business shall be made solely and exclusively by Dealer and any suggestions that may be made by QuickLoadz's personnel shall not be prescriptive or requirements of this Agreement, but shall be construed as advisory opinion only. The sole compensation of Dealer in relation to this Agreement, its formation, performance and termination, shall be its proceeds on the resale of the Trailers and truck beds to Customers within the Territory.

**2.4 No Authority to Commit**. Dealer is not authorized to, and shall not, create, enter into, or execute any contract, obligation, order, or other commitment, whether express or implied, which in any way obligates

QuickLoadz in any manner to any third party, nor shall Dealer take any action that has the effect of creating the appearance of Dealer having such authority.

## PURCHASE AND RESALE OF TRAILERS AND TRUCK BEDS

3.1 **Order Acceptance or Rejection.** Dealer shall, from time to time, submit to QuickLoadz purchase orders in accordance herewith for the Trailers and truck beds. All orders placed by Dealer shall be subject to acceptance or rejection by QuickLoadz. Notwithstanding any terms and conditions that may be a part of Dealer's purchase order to QuickLoadz, all sales of Trailers and truck beds made by QuickLoadz to Dealer shall be governed solely and exclusively by the terms of this Agreement and QuickLoadz's standard terms and conditions, including those terms and conditions set out in Schedule "A" hereto. The parties agree that all terms and conditions set forth in any Dealer purchase order issued after the date hereof are hereby rejected and shall be null and void and of no effect on any purchase of Trailers and truck beds made hereafter by Dealer from QuickLoadz. Nothing contained in any Dealer purchase order issued after the date hereof shall be construed as an amendment hereto or a waiver hereof without the prior written consent of QuickLoadz.

3.2 **Pricing**. The current Dealer's price list sets out the prices for the Trailers and truck beds covered by this Agreement, FOB QuickLoadz's facility. QuickLoadz reserves the right to and may change its prices, discounts, or terms of sale at any time. Trailers and truck beds that are sold to Dealer by QuickLoadz under the terms of this Agreement shall be sold to Dealer at the prices that shall be established by QuickLoadz and in effect at the time of the order. All deliveries of Trailers and truck beds covered by this Agreement will be on the credit of Dealer and will constitute sales made directly to Dealer. QuickLoadz reserves the right to offer volume or other discounts to the Dealer, other distributors, dealers or agents, or to end user customers. QuickLoadz, in its sole and absolute discretion, may from time to time advance credit or cash repayments to the Dealer based on large orders and/or annual volumes of sales of Trailers and truck beds.

3.3 **Payment and Shipping.** Payment for the Trailers and truck beds ordered by Dealer shall be made as follows:

(a) For all orders less than $1,000 (excluding taxes, shipping and other similar costs), 100% of the invoice amount shall be paid by Dealer to QuickLoadz with the Purchase Order by check, prepaid wire transfer, Visa or MasterCard; and

(b) For all orders more than $1,000 (excluding taxes, shipping and other similar costs), 20% of the invoice amount shall be paid by Dealer to QuickLoadz with the Purchase Order by check, prepaid wire transfer, Visa or MasterCard, and the remaining 80% of the invoice amount shall be paid by Dealer to QuickLoadz on the date of shipment of such Trailers and truck beds to Dealer.

(c) Dealer shall be responsible for arranging and paying for all shipping, insurance, brokerage and other similar costs relating to the delivery of Trailers and truck beds from QuickLoadz to the Dealer. At the Dealer's request, QuickLoadz will arrange for shipping, insurance and brokerage on behalf of the Dealer and add all related charges to the Dealer's invoice.

(d) QuickLoadz will use its best efforts to ship all accepted orders within 90 business days of the receipt of the applicable payment specified in Section 3.3(a) or the applicable first payment specified in Section 3.3(b) above, subject to the volume of orders and production schedules of QuickLoadz at any particular time, which may delay such timing.

3.4 **Initial Order.** Upon the execution of this Agreement, Dealer must place an initial order with QuickLoadz of one or more Trailers and truck beds. Dealer will maintain a minimum of one QuickLoadz in stock at all times.

3.5 **Annual Minimum Purchases.** The Dealer is expected to purchase a minimum of two Trailers and truck beds in each contract year of this Agreement, failing which QuickLoadz may terminate this Agreement after the first contract year.

3.6 **Re-sales.** Nothing contained herein shall be deemed in any way to limit the right of Dealer to determine the

prices or terms (except QuickLoadz's warranty terms) at which Trailers and truck beds may be resold by Dealer. Dealer will resell Trailers and truck beds at prices determined solely by Dealer, whether greater or lesser than any prices listed, suggested, or charged by QuickLoadz. It is understood that Dealer shall buy and sell the Trailers and truck beds in its own name, for its own account, at prices and on conditions determined by it, in compliance with this Agreement.

3.7 **Warranties; Exclusive Remedy**. Each and every purchase of Trailers and truck beds by Dealer from QuickLoadz shall be subject solely to the foregoing and QuickLoadz's standard warranty and the exclusive remedies. QuickLoadz reserves the right to change the terms of the warranty. Dealer agrees to either include the warranty or include the language of the warranty in any sales contract, invoice, or other acknowledgement for the sale of Trailers and truck beds made by Dealer. Dealer further agrees that it will not make any statement to any Customer, purchaser or user of any Product that could be construed as altering, extending, or expanding QuickLoadz's warranty or limitation of liability covering the Trailers and truck beds, provided however that Dealer may extend the Product warranty at its own cost and provided that such warranty extension results in no liability to the QuickLoadz. Dealer may not extend QuickLoadz's warranty in connection with the sale of Trailers and truck beds if such Trailers and truck beds have in any way been altered or modified by Dealer or if such Trailers and truck beds are not to be used in strict conformity with QuickLoadz's specifications. Dealer shall not in any way alter or modify Trailers and truck beds (or the parts or components thereof) without the prior written authorization of QuickLoadz. Any warranty given by Dealer with respect to Trailers and truck beds that have been altered or modified by Dealer or on behalf of Dealer or any such additional warranty or representation made by Dealer shall be void with respect to QuickLoadz and shall be the sole responsibility of Dealer.

3.8 **Exclusion of Consequential Damages; Limitation of Liability.** IN NO EVENT SHALL QUICKLOADZ BE LIABLE FOR ANY PENALTIES (INCLUDING, WITHOUT LIMITATION, ADMINISTRATIVE PENALTIES), SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, HOWEVER OCCURRING, INCLUDING BUT NOT LIMITED TO, DAMAGES FOR ECONOMIC LOSS, LOSS OF GOOD WILL, LABOUR COSTS, LOSS OF PROFITS OR REVENUES, OR CLAIMS RESULTING FROM CONTRACTS BETWEEN DEALER, ITS CUSTOMERS, END-USERS AND/OR SUPPLIERS, REGARDLESS OF WHETHER ANY OF THE FOREGOING ARISES FROM THIS DOCUMENT OR QUICKLOADZ'S PERFORMANCE HEREUNDER OR IN CONNECTION WITH THE USE OF, OR INABILITY TO USE, THE TRAILERS AND TRUCK BEDS FOR ANY PURPOSE WHATSOEVER. Subject always to the foregoing sentence, the total liability of QuickLoadz for any other kind of damages arising from any cause of action or claim whatsoever, whether: (a) in contract; (b) in tort (including negligence, whether sole, joint, contributory, concurrent, or otherwise, but not including intentional, reckless, or wanton tort); (c) under strict liability; (d) arising out of any representation or instruction, or under any warranty; or (e) otherwise arising out of, connected with, or resulting from the design, manufacture, sale, resale, delivery, repair, replacement, use

or misuse of any Trailers and truck beds or the furnishing of any service shall in no event exceed the price allocable to and paid to QuickLoadz for the individual unit of Trailers and truck beds or service or part thereof which gives rise to the cause of action or claim. QuickLoadz and Dealer acknowledge and agree that the exclusions of remedies and limitations of liability and damages herein reflect a bargained-for allocation and limitation of risk, liability, and damages. This Section shall apply notwithstanding any other provision of this Agreement.

3.9 **All Sales Final**. All sales to the Dealer are final No Trailers and truck beds may be returned without prior written authorization from QuickLoadz.

<u>DUTIES AND OBLIGATIONS OF THE DEALER</u>

4.1 **Sales Promotion; Actions by Dealer.** Dealer agrees that it will use its best efforts to sell and actively promote, in all lawful ways, the sale and distribution of the Trailers and truck beds in the Territory. Dealer shall not make any representation or statement to prospective purchasers, Customers or end-users of Trailers and truck beds in connection with the manufacture, installation, repair, replacement, use, selection of materials, or operation of the Trailers and truck beds or other terms or conditions of the sale thereof, except as specifically authorized by QuickLoadz. Dealer agrees not to recommend Trailers and truck beds for unsuitable applications or any

application not recommended by QuickLoadz. Dealer agrees to not publish and to not permit to be published any testimonials, photographs, or statements of any person concerning QuickLoadz or the Trailers and truck beds without first obtaining the written consent of QuickLoadz. Dealer shall not engage in any activity that would in any way diminish or detract from the sales potential of the Trailers and truck beds or their attractiveness to potential buyers or users thereof. Dealer agrees to promptly advise QuickLoadz of any complaints with respect to Trailers and truck beds. Dealer shall make clear with customers and prospective customers that it is acting as a Dealer of the Trailers and truck beds and not as agent of QuickLoadz. Accordingly, the Dealer shall: (a) be responsible for all customer account receivables; and (b) not pledge the credit of QuickLoadz or give any condition or warranty or make any representation on behalf of QuickLoadz or commit QuickLoadz to any contracts nor, without the prior written consent of QuickLoadz, make any promises or guarantees with reference to the Trailers and truck beds beyond those contained in the promotional material supplied by QuickLoadz or otherwise incur any liability on behalf of QuickLoadz.

4.2 **Dealer's Business**. Dealer warrants and represents to QuickLoadz that Dealer has, and agrees that it will maintain during the term of this Agreement, all resources (may include equipment, facilities, materials, and knowledgeable personnel) necessary to actively promote the Trailers and truck beds. Dealer shall inform QuickLoadz immediately of any changes which might affect the performance of its obligations hereunder. Additionally Dealer shall remain in full compliance and have an active Automotive Dealer License, vendor's license and any other licenses required by the states in which they do business. Dealer shall maintain and keep up to date any and all taxes and fees associated with the required licenses. In no way is QuickLoadz responsible for these fees or taxes.

4.3 **Insurance**. Dealer shall maintain, at Dealer's own expense, general public liability and property damage insurance with policy limits no less than *One Million Dollars ($1,000,000)* protecting Dealer against loss by reason of liability arising from the performance of this Agreement and/or Trailers and truck beds. Dealer will provide written proof of this insurance to QuickLoadz.

4.4 **Indemnity by Dealer**. Dealer hereby agrees to and shall indemnify, defend, and hold harmless QuickLoadz, its directors, officers, agents, employees, shareholders, debtholders and debenture holders from and against each and every cause of action, claim, lawsuit, loss, cost, damage, tax, expense (including reasonable legal fees) or liability, arising out of or related to: (i) loss of or damage to the property, or death of, or personal injury to Dealer, its Customers and/or any third party; and/or (ii) any lawsuit or claim against, or damage to, QuickLoadz resulting from or in connection with any breach hereof, non-compliance herewith, or the actions or failure to act of Dealer, its directors, officers, agents, or employees, including but not limited to: (a) breach of any of the provision of this Agreement by Dealer; (b) negligence or other tortious conduct by Dealer or its authorized agents; (c) representations or statements not specifically authorized by QuickLoadz herein or otherwise in writing; (d) violation by Dealer of any law, regulation, or order now or hereafter in effect in the Territory; or (e) death or injury to persons who use the Trailers and truck beds, due to inaccurate or incomplete information provided to Customers and/or end-users using the Trailers and truck beds.

DUTIES OF QUICKLOADZ

5.1 **Sale of Trailers and truck beds**. QuickLoadz will sell Trailers and truck beds to Dealer in accordance with the terms of this Agreement.

5.2 **Consultation**. QuickLoadz agrees, at reasonable times during business hours, to make itself available for technical advice and consultation in connection with the sale of the Trailers and truck beds. Such assistance shall be without charge to Dealer, except as may be otherwise mutually agreed.

INTELLECTUAL PROPERTY RIGHTS

6.1 **Intellectual Property Ownership**. Dealer recognizes and agrees that all intellectual property rights relating to the Trailers and truck beds, QuickLoadz, and/or to this Agreement, including but not limited to all trademarks, service marks, copyrights, patents, trade names, trade secrets, logotypes, advertising and other commercial symbols, and goodwill (collectively, "Intellectual Property"), whether registered or not, used on or related to the Trailers and truck beds or QuickLoadz, are and shall remain the sole property of

QuickLoadz. Nothing in this Agreement shall be deemed to confer upon or transfer to Dealer any right, title, interest, or license, whether express or implied, in or to any of QuickLoadz's Intellectual Property. Dealer further agrees to immediately report to QuickLoadz any illegal use or infringement of QuickLoadz's Intellectual Property.

**6.2 Use of Marks and Names.** Dealer covenants and agrees that it will not during the term hereof or at any time thereafter, adopt or use QuickLoadz's Intellectual Property, without prior written approval of QuickLoadz. Dealer covenants and agrees not to remove, alter, deface, conceal, or add to any trademark, trade name, service mark, label, marking, logo, decal, type, or serial number that may be affixed to or marked on the Trailers and truck beds, and Dealer shall take all reasonable steps to ensure that any trademark, trade name, service mark, label, marking, logo, decal, type, or serial number affixed to or marked on the Trailers and truck beds is not removed, altered, or defaced by others. Dealer will not use the corporate name of QuickLoadz or any trademark, service mark, trade name or other Intellectual Property of QuickLoadz, in or on any of its telephone directory listings, letterheads, business cards, or other office or business supplies in a manner or form without the prior written approval of QuickLoadz. Dealer shall not use the Intellectual Property in any way which would tend to allow any of it to become generic, lose its respective distinctiveness, become liable to mislead the public or be materially detrimental to, or inconsistent with, the good name, goodwill, reputation and image of QuickLoadz. The Dealer shall immediately report to QuickLoadz any potential infringement in the Territory of QuickLoadz's Intellectual Property and shall assist QuickLoadz in protecting its right, title and interest therein. The Dealer shall immediately report any imitation of the Trailers and truck beds to QuickLoadz.

**6.3 Confidentiality.** Dealer agrees that all know-how, drawings, blueprints, manuals, letters, notes, notebooks, reports, sketches, formulae, memoranda, dealer pricing, sales and technical bulletins, service manuals, customer lists, and all other material and specifications furnished by QuickLoadz to Dealer pursuant to or in connection with this Agreement that in any way relate to the Trailers and truck beds and/or QuickLoadz's business (collectively, "Confidential Information") shall be and remain the sole and exclusive property of QuickLoadz. Dealer acknowledges and agrees that Confidential Information is and will be comprised of valuable trade secrets of, and is proprietary to, QuickLoadz, and shall be used only as directed by QuickLoadz in writing and then only to the extent necessary to acquaint potential

purchasers of Trailers and truck beds with the use thereof. Dealer covenants and agrees that it will not at any time during the term hereof or at any time thereafter use such Confidential Information for its own benefit or disclose or allow to be disclosed any such Confidential Information to any third party, including prospective purchasers, except in accordance herewith. The foregoing obligations shall not extend to information that is or becomes public through no fault of Dealer, its agents, owners, officers, directors, or principals. QuickLoadz may notify anyone doing business with Dealer or evidencing an intention to do business with Dealer as to the existence and provisions of this Section.

## COMPLIANCE WITH LAWS, RULES AND REGULATIONS

**7.1 Dealer's Compliance.** Dealer shall at all times hereafter, at its expense, comply with any and all laws, rules, regulations, and orders that may be applicable to Dealer and/or this Agreement, and any and all laws, rules, regulations, and orders that govern or affect the ordering, shipment, import, sale, delivery, or redelivery of Trailers and truck beds in the Territory including without limitation, obtaining any necessary import licenses, certificates of origin or other requisite documents and collecting, remitting and paying all or any applicable taxes, charges, levies, customs duties, assessments and other fees of whatsoever kind in respect of the purchase and importation of the Trailers and truck beds into and the distribution of Trailers and truck beds within the Territory. Dealer agrees it will not engage in any course of conduct that, in QuickLoadz's reasonable belief, would cause QuickLoadz and/or Dealer to be in violation of any applicable laws, rules, regulations, and/or orders.

**7.2 Indemnification for Lack of Compliance.** Dealer shall indemnify and hold harmless QuickLoadz from and against all losses, taxes, costs, damages, or other penalties, including reasonable lawyer's fees incurred, assessed, or imposed, as a result of the violation by Dealer of any such law, rule, regulation and/or order. All payments by Dealer to QuickLoadz shall be made without prior demand, abatement, set-off or deduction.

## TERM AND TERMINATION

8.1 **Term**. The term of this Agreement shall commence on the Execution Date, and shall end on the 5th anniversary of the Execution Date; unless this AGREEMENT is sooner cancelled or terminated in accordance with its provisions.

8.2 **Amendment and Renewal.** This Agreement may be amended and renewed at any time by the mutual agreement of the parties, upon such terms and conditions as they may agree in writing.

8.3 **Termination without Cause.** Notwithstanding anything contained herein, but subject to earlier termination pursuant to Section 8.4, this Agreement may be terminated at any time after the Effective Date, without cause, by Dealer giving the QuickLoadz ninety (90) days prior written notice of termination, which termination shall operate without prejudice to the parties' rights and obligations that may have accrued in accordance herewith prior to the effective date of such termination.

8.4 **Termination by QuickLoadz.** For greater certainty and in addition to any other rights herein, the parties hereto agree that QuickLoadz may immediately terminate this Agreement upon written notice given to Dealer, upon the occurrence of one or more of the following events, which occurrence shall for all purposes be deemed to be, and shall be treated as, non-performance of an essential obligation of this Agreement:
(a) any assignment or attempted assignment (whether by contract, operation of law, or otherwise) by Dealer of any interest in this Agreement without QuickLoadz's written consent, which consent may be unreasonably withheld or delayed;
(b) indictment or conviction in any court of competent jurisdiction of Dealer, or a manager, partner, principal, officer, major stockholder or director thereof for any violation of law tending, in QuickLoadz's

sole opinion, to adversely affect the operation or business of Dealer or the good name, goodwill, or reputation of QuickLoadz, the Trailers and truck beds, or Dealer;
(c) submission by Dealer to QuickLoadz of any incorrect, false, or fraudulent reports or statements, including without limitation claims for any refund, credit, rebate, incentive, allowance, discount, reimbursement, or other payment by Dealer;
(d) the institution of any bankruptcy, winding up, or liquidation proceedings on behalf of, or against, Dealer;
(e) Dealer makes any arrangements with its creditors or has a receiver, manager or administrator appointed in respect of all or any part of its assets;
(f) execution should be enforced upon the property of Dealer and not stayed within a period of thirty (30) days;
(g) non-compliance with, or breach by, Dealer of any of the representations, warranties, covenants, agreements, provisions, terms, or conditions hereof; and/or
(h) Dealer's failure to meet its financial obligations to QuickLoadz in a timely manner.
(i) Ninety (90) days prior written notice of termination, which termination shall operate without prejudice to the parties' rights and obligations that may have accrued in accordance herewith prior to the effective date of such termination.
Dealer covenants and agrees to immediately advise QuickLoadz in writing of the occurrence of any event specified in this Section.

8.5 **Rights of Parties on Termination**. In the event of any termination pursuant to Section 8.3 or Section 8.4, the following shall apply:

(a) No Claim or Damage On Termination. The right to terminate this Agreement as set forth herein is absolute, and neither QuickLoadz nor Dealer will be liable to the other by reason of termination (whether with or without cause) of this Agreement for any claims, causes of action, demands, damages, penalties, or indemnities of any kind or nature, including without limitation claims or damages on account of: loss of goodwill; loss of present or prospective profits on sales or anticipated sales; expenditures, investments, loans, or leases related to Dealer's business or in reliance on the existence of this Agreement; statutory or other indemnities; commitments in connection with the establishment, development, or maintenance of Dealer's business or goodwill related thereto; injury to Dealer's reputation as a result of termination; or any other reason whatsoever. The claims, causes of action, rights, and remedies (whether arising out of any statute, rule, or regulation of any governmental body) of either party hereto arising as a result of, or connected with, termination of this Agreement shall be solely and exclusively as set forth in this Agreement. In the event of termination of this Agreement as set

forth herein for any reason or for no reason, QuickLoadz will thereafter and hereafter stand wholly freed and discharged, and Dealer hereby expressly releases and discharges QuickLoadz of and from any and all obligations, causes of action, claims, demands, damages, penalties, or liabilities whatsoever, whether arising hereunder, or related to this Agreement or the subject matter hereof.

(b) No Compensation. Dealer shall have no claim for money or compensation of any kind with respect to the sale of Trailers and truck beds at any time after the effective date of termination, regardless of prior efforts of Dealer with respect to any customer or the Trailers and truck beds. Dealer shall not be entitled to any separation compensation, restitution, quantum merit, indemnity, or damages of any kind or nature. Dealer, for itself and all who may claim under it, hereby renounces and waives the benefit of, and covenants that it will not any time hereafter insist upon, plead, claim, or take the benefit or advantage of, any law, statute, or regulation providing separation or termination compensation, or indemnity of any kind to Dealer as a result of termination of this Agreement.

(c) Cancellation of Orders. Any orders placed by the Dealer as of the date of giving the notice of termination will be automatically cancelled without charge unless otherwise agreed.

(d) No Right to Continue. QuickLoadz shall have no right to require Dealer to continue to act as a Dealer of Trailers and truck beds, or any of them, and Dealer shall have no right to require QuickLoadz to continue to supply Trailers and truck beds, or any of them, to Dealer or any other person. Each of QuickLoadz and Dealer covenants and agrees that at no time will it commence any action or proceeding wherein it alleges that it has or had any such rights.

(e) Allocation of Rights and Remedies. The parties hereto have freely negotiated, obtained, and given consideration for the termination rights, obligations, and remedies set forth in this Agreement. The limitation of remedies, claims, liabilities, and damages for termination of this Agreement reflect a bargained-for allocation and limitation of such remedies, claims, liabilities, and damages. It is the intention and desire of the parties to this Agreement that the rights, obligations, and limitation of remedies of the parties hereto on termination hereof be set forth solely and exclusively herein and be enforceable and enforced as written and agreed herein.

8.6 **Duties of Dealer Related To and After Termination**. In addition to obligations imposed elsewhere herein, on termination of this Agreement, with or without cause, the following shall apply:

(a) QuickLoadz will, at its sole option, either: (i) permit the Dealer to sell any Trailers and truck beds inventory in its possession at the time of such termination, or (ii) require the Dealer to return all such undamaged inventory to QuickLoadz, and QuickLoadz will reimburse the Dealer for the purchase price of such inventory and pay for delivery. If there is damage to the returned inventory QuickLoadz will be entitled to reduce the amount refunded to the Dealer. After the sale of the inventory as set out in (i) above, or immediately upon the notice from QuickLoadz as set out in (ii) above, as applicable, Dealer shall immediately cease to describe itself as a Dealer of the Trailers and truck beds and/or QuickLoadz and, further, shall immediately cease and refrain from the sale, promotion, offering, forwarding, and shipping of the Trailers and truck beds and shall return to QuickLoadz, and immediately cease the use of, Confidential Information (and all copies thereof) and Intellectual Property (and all copies thereof). Dealer also shall take such action as is necessary to terminate the Dealer's registration or authorization with any governmental authority or agency as a Dealer of Trailers and truck beds.

(b) Dealer shall remove from its property (including, without limitation, telephone directory listings, letterheads, signs, business cards, or other office or business supplies), and immediately discontinue all direct or indirect use of Intellectual Property now or hereafter owned or controlled by QuickLoadz, or of any word, title, expression, trademark, trade name, design, or marking that, in the opinion of QuickLoadz, is confusingly similar thereto. If requested by QuickLoadz, Dealer shall certify in writing that Dealer has completely terminated its use of any and all such Intellectual Property, or any other word, title, expression, trademark, trade name, design, or marking similar thereto that appeared in or on any devices or other materials used in conjunction with Dealer's business.

8.7 In addition to the automatic termination provisions set forth herein, either party may terminate this Agreement in the event of material breach by the other party, provided that such party has given the other party thirty (30) days written notice of such breach, identified the nature of the breach, and within said notice period such breaching party has failed to cure the asserted breach.

8.8 **Survival**. Notwithstanding anything contained herein, including but not limited to Sections 8.3 and 8.4 above, upon termination or expiration of this Agreement for any reason, Dealer shall not be released from its obligations to pay monies due or to become due to QuickLoadz or to complete any other unfulfilled obligations under this or any other agreement, and Dealer shall immediately pay and discharge all debts, and shall perform all obligations set forth in, and be otherwise subject to, Sections 3.7 and 3.8, as well as Sections 2, 6, 7, 8 and 10, all of which shall survive and continue after expiration or termination hereof and shall bind Dealer and its successors and permitted assigns. This Section shall apply notwithstanding anything herein contained. All remedies of QuickLoadz contained herein, or otherwise available pursuant to law or equity, shall be cumulative and not alternative. Nothing herein contained shall be construed so as to limit the remedies available to QuickLoadz. Without limiting the generality of the foregoing, it is understood and agreed that QuickLoadz shall have the right, at any time and from time to time in its sole discretion to refuse to accept any purchase order.

<u>MISCELLANEOUS</u>

9.1 **Assignment or Transfer Prohibited**. This Agreement and the rights and duties of Dealer hereunder are not assignable, transferable, or subject to delegation by Dealer without the prior written consent of QuickLoadz, which consent may be unreasonably withheld or delayed, and any attempted assignment, transfer, or delegation without such written consent shall be null and void.

9.2 **Severability**. If any one or more provisions of this Agreement shall be unenforceable, such unenforceability shall not affect the other provisions of this Agreement. To the extent permitted by applicable law, the parties hereto waive any provision of law that renders any term or provision hereof unenforceable in any respect.

9.3 **Amendment; Waiver**. Any amendment or modification to this Agreement shall not be binding upon either party unless agreed to in writing by authorized representatives of each party. No delay or omission on the part of either party in exercising any right hereunder will operate or be construed as a waiver of that right or of any other right hereunder, nor will any delay or omission operates as an estoppel to the future exercise of that right, nor will any delay, omission, or waiver on any one or more occasion be deemed a waiver of that right, or any other right on any future occasion.

9.4 **Notices**. Any notice required to be given by this Agreement or otherwise by either party, shall be considered properly and timely given when sent by prepaid courier, first class, registered, or certified mail, return receipt requested, and addressed to the other party at the address set forth at the beginning of this Agreement or to such other address as may be designated by either party from time to time. Any such notice will be deemed to be delivered upon actual receipt by the recipient.

9.5 **Entire Agreement**. This Agreement sets forth the entire agreement and understanding between the parties regarding the subject matter hereof, and merges all prior discussions and negotiations, verbal or written, between them. Neither of the parties shall be bound by any conditions, definitions, representations, or warranties, verbal nor written, with respect to the subject matter of this Agreement other than as expressly provided herein. This Agreement supersedes and is in lieu of all existing agreements or arrangements between the parties hereto relating to the subject matter hereof. No course of dealing between the parties, no usage of trade, and no parole or extrinsic evidence of any nature shall be used to supplement or modify any of the terms or conditions of this Agreement or shall be construed as creating a new contract.

9.6 **Counterparts; Section Headings.** This Agreement may be executed, accepted, and delivered in any number of counterparts and by facsimile transmission, each of which shall be an original, but such counterparts together constitute but one and the same instrument. The section headings are inserted for convenience only and are not to be construed as part of this Agreement.

9.7 **Governing Law**. This Agreement shall be governed, construed, interpreted and enforced solely and exclusively in accordance with the laws and courts of Athens County, Athens Ohio, USA.

9.8 **Force Majeure.** No party shall be liable for any failure to perform its obligations herein (except the obligation to make timely payment) if such failure results from any act of God, riot, civil unrest, flood, earthquake, or other cause beyond such party's reasonable control, including without limitation any mechanical, electronic or communications failure, strike, work disruption, sickness, disruption of the supply of utilities or failure of suppliers to make timely deliveries.

**IN WITNESS WHEREOF** the parties hereto have caused this Agreement to be executed and do each hereby warrant and represent that its respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate action to execute this Agreement, which shall be effective as of the date first herein above written.

(Company)

By: _____

Its: QuickLoadz

2/9/2022


(Dealer)

By: _William 2 Well_____

Its: Acme-Works, LLC dba CoyoteContainer.com

Date: 02-04-2022

# dealer_agreement_2021 v3.pdf

**Final Audit Report**                                                                 2022-02-09

| | |
|---|---|
| Created: | 2022-02-05 |
| By: | Bill Hall (bill@wlhall.net) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAApP6JU9Dtg2FgxSBBc4FKhAGJhePlhB-L |

## "dealer_agreement_2021 v3.pdf" History

📄 Document created by Bill Hall (bill@wlhall.net)
2022-02-05 - 1:23:44 AM GMT- IP address: 157.131.141.191

📧 Document emailed to Sean Jones (sjones@quickloadz.com) for signature
2022-02-05 - 1:25:38 AM GMT

📄 Email viewed by Sean Jones (sjones@quickloadz.com)
2022-02-05 - 12:34:33 PM GMT- IP address: 64.233.172.63

✍️ Document e-signed by Sean Jones (sjones@quickloadz.com)
Signature Date: 2022-02-09 - 1:12:23 PM GMT - Time Source: server- IP address: 143.244.44.70

✅ Agreement completed.
2022-02-09 - 1:12:23 PM GMT

**Adobe Sign**